UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRUCE ROUSSEAU, Individually and On Behalf of All Others Similarly Situated,<br><br>                            Plaintiff,<br><br>        v.<br><br>3M COMPANY, INGE G. THULIN, MICHAEL F. ROMAN and NICHOLAS C. GANGESTAD,<br><br>                        Defendants. | Case No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Bruce Rousseau ("Plaintiff"), by Plaintiff's undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff and upon information and belief based on the investigation of Plaintiff's attorneys as to all other matters, which included, among other things, a review and analysis of: 3M Company's ("3M" or the "Company") Securities and Exchange Commission ("SEC") filings, Company releases, conference calls, defendants' public statements, media reports, analyst reports, industry reports, other complaints filed against 3M, and other publicly available information. Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This securities class action is brought on behalf of purchasers of 3M securities between February 9, 2017 and May 28, 2019, inclusive (the "Class Period") against 3M, its current and former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") for violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) by engaging in a scheme to defraud investors and issuing false and misleading statements to conceal the truth about the Company's exposure to legal liability associated with its most lucrative product offerings: man-made chemicals known as per- and polyfluoroalkyl substances ("PFAS").

2.      3M is an American multinational conglomerate corporation that produces a variety of chemical substances and related products.  3M's most lucrative product has been PFAS.  PFAS are characterized by bonds between carbon and fluorine that are among the strongest in organic chemistry.  PFAS are man-made chemicals that come in 5,000 or more varieties and are used in industrial and consumer products, including non-stick cookware, water-repellent clothing, camping gear, shoes, stain resistant fabrics, textiles and carpets, cosmetics,

surfactants for electronics manufacturing, and products that resist grease, water, and oil, such as coated papers for fast-food takeout.

3.      Two of the best-known PFAS, which are unregulated, industrial chemicals, which 3M has produced for decades, include perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), also called C8 because of the eight-carbon chain that makes up its chemical backbone.  3M's PFAS are used in products worldwide, including Scotchgard stain protectant, Teflon cookware, Gore-Tex water resistant outdoor gear, greaseproof food paper, and aqueous firefighting foam.  The same property that makes PFAS so effective in consumer products, one of the strongest molecular bonds ever discovered, means PFAS do not break down in the environment, hence the ominous nickname "forever" chemicals.

4.      3M has repeatedly claimed that PFAS are not a danger to public health.  "'While the science behind PFAS is complex, the vast body of scientific evidence, which consists of decades of research conducted by independent third parties and 3M, does not show that PFOS or PFOA causes harm in people at current or historical levels,'" said company spokeswoman Fanna Haile-Selassie in a November 2018 Bloomberg article.

5.      In 2010, the State of Minnesota sued 3M, demanding $5 billion to clean up the damage 3M caused in the state.  On the eve of trial in February 2018, the case settled for $850 million, without any admission of wrongdoing by 3M.  The settlement was the third-largest for a natural-resource damage claim in history, behind the Deepwater Horizon and Exxon Valdez oil spill settlements.

6.      While publicly denying that PFAS cause harm to humans and the environment, defendants concealed and misrepresented: (i) 3M's vast internal evidence dating back decades confirming that PFAS are toxic (which was first publicly revealed in February 2018 by

Minnesota's Attorney General); (ii) 3M's decades-long history of suppressing negative information and/or damaging data about PFAS; and (iii) 3M's legal exposure to state, county, and local governments and individuals around the country as a result of its knowledge and intentional concealment of the toxic harm caused by the use of PFAS. These omissions and misrepresentations caused 3M's stock price to trade at artificially inflated prices throughout the Class Period.

7.     On April 25, 2019, 3M announced its first quarter 2019 financial results, acknowledging that the first quarter of 2019 "was a disappointing start to the year for 3M" and disclosing that on top of the "$1.16 per share impact" already recorded in the first quarter of 2018 related to the settlement with the State of Minnesota, 3M had "recorded significant litigation-related pre-tax charges of $548 million, or $0.72 per share" in the first quarter 2019 for additional PFAS liability. 3M also announced that it was cutting 2,000 jobs, approximately 2% of its 93,500 employees, and trimming fiscal year 2019 capital expenditures, including on manufacturing, in addition to accelerating other cost control reductions it said were already underway.

8.     On this news, the price of 3M common stock fell $28.36 per share, or nearly 13%, to close at $190.72 per share on April 25, 2019.

9.     On May 14, 2019, New Jersey filed suit against 3M and other PFAS manufacturers alleging environmental and consumer fraud claims in connection with making and selling firefighting foam products for decades in New Jersey that contained toxic chemicals. Noting that nearly one in five New Jersey residents had received tap water that contained at least trace amounts of one of these chemicals, some of which have been linked to cancer, the lawsuit alleged that the companies knew that their firefighting foam posed a significant health threat.

10.     On May 29, 2019, New Hampshire filed two lawsuits against 3M and others for PFAS contamination.  New Hampshire Attorney General Gordon MacDonald said the goal was to recoup damages for the PFAS contamination that had been found in all ten New Hampshire counties, noting that, in towns like Merrimack and Portsmouth, the contamination had put hundreds of families on bottled water.  "'It is my hope that those responsible for the manufacture and distribution of PFAS will recognize the severity of the issues they've caused and will become part of the solution,'" MacDonald was quoted saying.

11.     On this news, the price of 3M common stock declined from its close of $163.35 per share on May 28, 2019 to trade as low as $160.50 per share in intraday trading and close at $161.40 per share on May 29, 2019.

12.     On June 6, 2019, Barclays issued a report, entitled "PFAS/PFOS/PFOA Liabilities for Chemours, 3M, and JCI," stating in relevant part:

> PFAS/PFOS/PFOA liability for Chemours, 3M, and JCI has been top-of-mind for many of our Industrial/Materials investors in recent weeks for three main reasons: a) an investor presentation on the risks to MMM/CC at the Sohn conference in early May. After the Sohn conference on May 6th, CC and MMM were down the two days after that presentation 8% and 2% respectively vs. the XLI down 2%. b) 3M updated its reserve for remediating plant sites with PFAS contamination with 1Q earnings. c) The state of NJ AG came out with a headline grabbing suit against CC/3M/JCI plus others on March 25th.

13.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), as the claims asserted

herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).

16.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## **PARTIES**

17.     Plaintiff, as set forth in the attached Certification, acquired 3M securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.     Defendant 3M is a Delaware corporation with its principal executive offices located at 3M Center, St. Paul, Minnesota.  3M's common stock trades on the New York Stock Exchange ("NYSE") under the ticker "MMM."

19.     Defendant Inge G. Thulin ("Thulin") previously served as 3M's Executive Chairman (July 2018-June 2019) and Chairman, President, and CEO (2012-July 2018). Defendant Thulin was also previously Executive Vice President and Chief Operating Officer of 3M (2011-2012), with responsibility for all of 3M's business segments and international operations, an Executive Vice President of International Operations (2004-2011), and originally joined 3M Sweden in 1979, working in sales and marketing.  As CEO, defendant Thulin spoke on 3M's behalf in releases, conference calls, and SEC filings.  Pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. § 1350, defendant Thulin certified the Company's Form 10-Ks filed with the SEC on February 9, 2017 and February 8,

2018.   Defendant Thulin also signed the Company's Form 10-Ks dated February 9, 2017, February 8, 2018, and February 7, 2019.

20.     Defendant Michael F. Roman ("Roman") is 3M's Chairman of the Board (since May 2019) and CEO (since July 2018).  According to 3M's website, defendant Roman has also served as Chief Operating Officer, led 3M's largest business group and was the Company's chief strategist.  Defendant Roman joined 3M in 1988 as a senior design engineer.  As CEO, defendant Roman spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. § 1350, defendant Roman certified the Company's Form 10-K filed with the SEC on February 7, 2019. Defendant Roman also signed the Company's Form 10-K dated February 7, 2019.

21.     Defendant Nicholas C. Gangestad ("Gangestad") has served as 3M's CFO since 2014.  As CFO, defendant Gangestad spoke on 3M's behalf in releases, conference calls, and SEC filings.  Pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Gangestad certified the Company's Form 10-K filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019.  Defendant Gangestad also signed the Company's Form 10-Ks dated February 9, 2017, February 8, 2018, and February 7, 2019 on 3M's behalf.

22.     Defendants Thulin, Roman, and Gangestad are sometimes collectively referred to herein as the "Individual Defendants."

23.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of 3M, were in possession of and privy to confidential, proprietary information concerning 3M, its products, operations, finances, and financial condition, and its legal liability for PFAS-related litigation.  Because of their positions as 3M's senior-most executive officers,

the Individual Defendants obtained, had access to, and/or were in possession of material adverse nonpublic information concerning 3M via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith. As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     As senior executive officers and controlling persons of a publicly traded company whose common stock, during the Class Period, was registered with the SEC pursuant to the Exchange Act and was actively traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding 3M's operations, business, and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of 3M securities would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

### Background

25.     3M is an American multinational conglomerate corporation that produces a variety of chemical substances and related products. 3M's most lucrative product has been PFAS. PFAS are characterized by bonds between carbon and fluorine that are among the strongest in organic chemistry. PFAS are man-made chemicals that come in 5,000 or more varieties and are used in industrial and consumer products, including non-stick cookware, water-repellent clothing, camping gear, shoes, stain resistant fabrics, textiles and carpets, cosmetics,

surfactants for electronics manufacturing, and products that resist grease, water, and oil, such as coated papers for fast-food takeout.

26.     Two of the best-known PFAS, which are unregulated, industrial chemicals, which 3M has produced for decades, include PFOS and PFOA, also called C8 because of the eight-carbon chain that makes up its chemical backbone.  3M's PFAS are used in products worldwide, including Scotchgard stain protectant, Teflon cookware, Gore-Tex water resistant outdoor gear, greaseproof food paper, and aqueous firefighting foam.  The same property that makes PFAS so effective in consumer products, one of the strongest molecular bonds ever discovered, means PFAS do not break down in the environment, hence the ominous nickname "forever" chemicals.

27.     3M has repeatedly claimed that PFAS are not a danger to public health.  "'While the science behind PFAS is complex, the vast body of scientific evidence, which consists of decades of research conducted by independent third parties and 3M, does not show that PFOS or PFOA causes harm in people at current or historical levels,'" said company spokeswoman Fanna Haile-Selassie in a November 2018 Bloomberg article.

28.     In 2010, the State of Minnesota sued 3M, demanding $5 billion to clean up the damage 3M caused in the state.  On the eve of trial in February 2018, the case settled for $850 million, without any admission of wrongdoing by 3M.  The settlement was the third-largest for a natural-resource damage claim in history, behind the Deepwater Horizon and Exxon Valdez oil spill settlements.

**Materially False and Misleading Statements Issued During the Class Period**

29.     In each of its Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019, 3M made affirmatively misleading statements to investors regarding certain risk factors associated with investing in 3M, 3M's Environmental Law Compliance, and Environmental Matters and Litigation.

**False and Misleading Risk Factor Warning**

30.     Despite its actual knowledge of internal studies and documents evidencing the toxicity of PFAS dating back to the 1970s, as well as its awareness (or reckless disregard) of the potentially massive nationwide (and even global) legal liability for releasing PFAS into the environment since the 1960s, 3M only had one warning specific to its potential legal exposure in its Form 10-Ks.  The February 7, 2019 Form 10-K warning stated as follows:

> *\* The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti-bribery, anti-corruption, or other matters.* The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period. For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note 16 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

31.     Remarkably, the ***only*** change to that risk warning between 2017 and 2019 was to adjust the reference number of the note to the consolidated financial statements addressing legal proceedings in the last sentence.  Plainly, the risk warning was a generic "catch-all" provision that was not tailored to 3M's actual known legal risks.

**Environmental Law Compliance**

32.     3M's statement regarding the Company's Environmental Law Compliance likewise remained identical between 2017 and 2019, other than clerical edits to the year and amount expended on capital projects related to protecting the environment in the third paragraph. The February 7, 2019 Form 10-K's Environmental Law Compliance section stated as follows:

**Environmental Law Compliance**

3M's manufacturing operations are affected by national, state and local environmental laws around the world. 3M has made, and plans to continue making, necessary expenditures for compliance with applicable laws. 3M is also involved in remediation actions relating to environmental matters from past operations at certain sites (refer to "Environmental Matters and Litigation" in Note 16, Commitments and Contingencies).

Environmental expenditures relating to existing conditions caused by past operations that do not contribute to current or future revenues are expensed. Reserves for liabilities for anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan of action, or approval by regulatory agencies. Environmental expenditures for capital projects that contribute to current or future operations generally are capitalized and depreciated over their estimated useful lives.

In 2018, 3M expended approximately $27 million for capital projects related to protecting the environment. This amount excludes expenditures for remediation actions relating to existing matters caused by past operations that do not contribute to current or future revenues, which are expensed. Capital expenditures for environmental purposes have included pollution control devices – such as wastewater treatment plant improvements, scrubbers, containment structures, solvent recovery units and thermal oxidizers – at new and existing facilities constructed or upgraded in the normal course of business. Consistent with the Company's emphasis on environmental responsibility, capital expenditures (other than for remediation projects) for known projects are presently expected to be approximately $75 million over the next two years for new or expanded programs to build facilities or modify manufacturing processes to minimize waste and reduce emissions.

While the Company cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, ***the Company does not believe they will have a material effect on its capital expenditures, earnings or competitive position***.

33.     The fact that this statement regarding the effect of environmental compliance on 3M's capital expenditures and earnings did not change from 2017 to 2019, despite defendants' actual knowledge of the increasing scrutiny of and litigation relating to PFAS, including the $671 million DuPont PFAS settlement and $850 million Minnesota settlement, as well as the

additional litigation 3M disclosed each year in its Environmental Matters and Litigation discussion in the Form 10-Ks, is materially misleading to investors.

**Environmental Matters and Litigation**

34.     Unlike the risk factors and environmental law compliance sections of 3M's Form 10-Ks, which remained substantively identical from 2017 to 2019, the Environmental Matters and Litigation sections changed during that same period, as litigation relating to PFAS dramatically increased.   However, what did not substantively change (other than dates and dollar figures) was the last three paragraphs of this section, subtitled *Environmental Liabilities and Insurance Receivables*, which remained the same from 2017 to 2019 (other than edits to dates/dollar figures):

*Environmental Liabilities and Insurance Receivables*

As of December 31, 2018, the Company had recorded liabilities of $25 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million. The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

As of December 31, 2018, the Company had recorded liabilities of $59 million for "other environmental liabilities" based upon an evaluation of currently available facts to implement the Settlement Agreement and Consent Order with the MPCA (including the best estimate of the probable liability under the settlement of the NRD Lawsuit for interim treatment of municipal and private wells), the remedial action agreement with ADEM, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years.

*It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods.* Developments may occur that could affect the Company's current assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation techniques; (iv) success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. *For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition.* However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

35.     The MD&A disclosure violations and omissions were material under SEC disclosure rules, which place an emphasis on materiality:

Companies must provide specified material information in their MD&A, and they also must provide other material information that is necessary to make the required statements, in light of the circumstances in which they are made, not misleading.[1]

36.     Each of the MD&A disclosure violations and omissions discussed above were either required MD&A disclosures on their own or, at a minimum, were required in light of the existing MD&A disclosures that 3M made regarding litigation exposure.

**The Market Begins to Learn of the Falsity of Defendants' PFAS Statements, But Defendants Continue to Conceal the Truth**

---

[1]     *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations,* SEC Release Nos. 33-8350; 34-48960; FR-72, https://www.sec.gov/rules/interp/33-8350.htm#P18-1728 (last visited July 26, 2019).

37.     After Minnesota settled its lawsuit with 3M, the Minnesota Attorney General posted a trove of internal 3M emails and memos on a state website, which had never been published before.  As *The Intercept* reported on July 31, 2018, in an article by Sharon Lerner entitled "3M Knew About the Dangers of PFOA and PFOS Decades Ago, Internal Documents Show," including 3M's false denials:

> A lawsuit filed by Minnesota against 3M, the company that first developed and sold PFOS and PFOA, the two best-known PFAS compounds, has revealed that the company knew that these chemicals were accumulating in people's blood for more than 40 years. ***3M researchers documented the chemicals in fish, just as the Michigan scientist did, but they did so back in the 1970s. That same decade, 3M scientists realized that the compounds they produced were toxic.*** The company even had evidence back then of the compounds' effects on the immune system, studies of which are just now driving the lower levels put forward by the ATSDR, as well as several states and the European Union.
>
> The suit, which the Minnesota attorney general filed in 2010, charges that 3M polluted groundwater with PFAS compounds and "knew or should have known" that these chemicals harm human health and the environment, and "result in injury, destruction, and loss of natural resources of the State." The complaint argues that 3M "acted with a deliberate disregard for the high risk of injury to the citizens and wildlife of Minnesota." 3M settled the suit for $850 million in February, and the Minnesota Attorney General's Office released a large set of documents – including internal studies, memos, emails, and research reports – detailing what 3M knew about the chemicals' harms.
>
> Some of the documents had been under seal since 2005 as a result of a separate lawsuit over PFAS contamination in Minnesota. And the documents had been in the EPA's possession for at least 18 years: In 2000, 3M gave the EPA hundreds of documents it had withheld from the agency, resulting in more than $1.5 million in penalties in 2006 for 244 violations of the Toxic Substances Control Act. Even so, for years the EPA did nothing. Even as a few government officials and company scientists understood the vast dangers they posed, PFAS were allowed to spread into groundwater and then drinking water, into people and their children, into animals, plants and the food system where they remain today.
>
> *        *        *
>
> As a staff epidemiologist at 3M, Geary Olsen has had a wealth of data at his fingertips. The company he's worked for since at least 1998 makes more than 55,000 products and has more than 90,000 employees. Olsen had access to internal information about both and has been able to combine them to pursue the

kinds of scientific questions most researchers can only dream of being able to ask and answer.

In one study, for instance, Olsen looked at blood tests of 3M employees at the company's plants in Antwerp, Belgium, and Decatur, Alabama, both of which made PFOA and PFOS, among other products. By the late 1990s when Olsen was embarking on this research, these chemicals were known within the company to accumulate in humans and alter cholesterol levels in lab animals. Because the workers had undergone three separate rounds of blood tests, Olsen was able to trace the levels of the chemicals in workers' blood over time. And by combining his results with various clinical measures the company had been tracking in its workers, he was able to see whether there was a relationship between the chemical and these health outcomes.

Olsen's findings, written up in a draft report in October 2001, were clear. There was a positive association between the amount of PFOA in workers' blood and their levels of cholesterol and triglycerides, states the report, on which Olsen is listed as the principal investigator. The report devoted more than 20 tables to triglycerides and cholesterol, detailing a relationship that later studies would confirm: PFOA increased people's levels of triglycerides, which are a type of fat, and cholesterol, both of which can increase the chance of heart disease. The results were in keeping with rat evidence, as the report noted.

Yet less than two years later, when Olsen and the three co-authors on the report – all 3M employees – published an article based on the same research, it downplayed this key finding. Indeed, according to the study, which ran in the March 2003 issue of the Journal of Occupational and Environmental Medicine, "There were no substantial changes in hematological, lipid, hepatic, thyroid, or urinary parameters consistent with the known toxicological effects of PFOS or PFOA" – a statement that appears to contradict the authors' earlier finding.

In the 19th paragraph of the 2003 article, the authors note that PFOA was "positively associated with cholesterol and triglycerides" and that "serum PFOS was positively associated with the natural log of serum cholesterol . . . and triglycerides," but dismiss these effects as "minimal." The article omits most of the information that was contained in the draft's tables and clearly laid out the increase in cholesterol and triglycerides in exposed workers.

The minimizing of this bad news is just one of several instances in which 3M seems to have downplayed, spun, and tailored its own research to make these two PFAS chemicals and others it produced appear safer than they were, according to the documents made public by Minnesota's attorney general.

In some cases, relatively reassuring findings about the chemicals made their way into the scientific literature, while other more concerning ones – like the 1993 observation that goats passed PFOS to their offspring through their milk, or

the 1998 discovery that PFOS had made its way into eagles found in the wild, or the association between PFOA and lipids that Geary identified – did so only after many years. In several cases, 3M appears to have not pursued further research based on discoveries that suggested the chemicals posed harm. And the company also relied on several paid scientists, including John Giesy, now a professor at the University of Saskatchewan, who weighed in on the environmental impact of PFOA and PFOS without disclosing their funding from 3M.

In an email, *a 3M spokesperson strenuously denied that the company tailored its research around PFAS, writing that "neither 3M nor Dr. Olsen has distorted or suppressed the scientific evidence regarding PFAS in any way."* The email also pointed out that the company eventually gave the EPA Olsen's 2001 report, which at this point has "been publicly available for well over a decade." While acknowledging that Olsen found an association between cholesterol levels and PFOA, the 3M spokesperson noted that the effect of PFOA he documented in some workers – increasing cholesterol levels – was inconsistent with those observed in rats, whose levels decreased after exposure to the chemical, and that "the science is complex and neither the study nor the larger body of scientific evidence on this issue establishes causation."

In a separate email, *the 3M spokesperson wrote that "the Minnesota Attorney General released a small set of documents that should not be taken out of context in an effort to distort the full record regarding 3M's actions with respect to PFOA or PFOS. 3M acted reasonably and responsibly* in connection with products containing PFAS, and stands behind its environmental stewardship record."

38.     Thereafter, on November 2, 2018, *Bloomberg* reporters Tiffany Kary and Christopher Cannon published a lengthy exposé, entitled "Cancer-linked Chemicals Manufactured by 3M Are Turning Up in Drinking Water," which also contained 3M's false denials and noted in relevant part:

The [Minnesota] attorney general [Lori Swanson] wasn't finished. *She also said there had been a scientific cover-up – that 3M knew its chemicals were dangerous, yet kept that information from regulators and local residents.* Just as the suit settled, she posted a trove of 3M's internal emails and memos on a state website to back up her allegations.

*3M's Haile-Selassie called the internal memos a small set of documents that "portrays an incomplete and misleading story and distorts the full record" of 3M's work.* It also distorts "who we are as a company," she said.

The records, which include old typed field memos and presentations to 3M's board of directors, would appear to support Swanson's cover-up claim. As the company insisted for more than half a century that the chemicals were safe, the internal documents suggest that its own employees withheld evidence to the contrary. Meanwhile, they were woven into new innovations and spread everywhere, lodging in people and wildlife from the North Pole to the Faroe Islands. As Swanson was prepared to argue if the case had gone to trial, this gave Cottage Grove a regrettable distinction: "ground zero for a world problem."

\*       \*       \*

In 1997, a telling change appeared in the routine data sheets 3M sent to DuPont, which had been buying its PFAS for decades to manufacture Teflon. They said: "CANCER: WARNING: contains a chemical which can cause cancer." The warning cited joint studies by 3M and DuPont in 1983 and 1993, but gave no further details. Then, without explanation, the warnings soon disappeared, according to Minnesota's court filings.

\*       \*       \*

Scientists outside of 3M have become increasingly outspoken about the risks of PFAS. Linda Birnbaum, director of the toxicology program in the National Institutes of Health, said there's evidence the chemicals are toxic. Most of the thousands of PFAS variants haven't been tested, she said, but all that have been show problems. Phil Brown, a Northeastern University sociology professor who specializes in toxic exposures, likens 3M's actions to cigarette makers who for decades avoided liability from their products' links to cancer.

\*       \*       \*

[College Grove Mayor Myron] Bailey said 3M has been more generous than usual since the settlement. But he wants something more than the company's money. ***"To this day they have said they don't believe anything is wrong,"*** he said. "If you are a business or individual who has done something wrong, I believe you can be accountable, and say you did it."

## EPA Proposed Action on PFAS

39.     On February 14, 2019, the EPA unveiled its PFAS Action Plan.  The same day,

3M issued a public statement on the EPA's PFAS Action Plan, stating:

"3M supports EPA's creation of a PFAS Action Plan and looks forward to reviewing the plan in detail. 3M agrees with EPA moving forward with the Safe Drinking Water Act's maximum contaminant level process with respect to PFOA and PFOS. We support regulation rooted in the best-available science and believe

that this plan may help prevent a patchwork of state standards that could increase confusion and uncertainty for communities."

## The Truth Emerges

40.     On April 25, 2019, 3M announced its first quarter 2019 financial results, acknowledging that the first quarter of 2019 "was a disappointing start to the year for 3M" and disclosing that on top of the "$1.16 per share impact" already recorded in the first quarter of 2018 related to the settlement with the State of Minnesota, 3M had "recorded significant litigation-related pre-tax charges of $548 million, or $0.72 per share" in the first quarter 2019 for additional PFAS liability.  3M also announced that it was cutting 2,000 jobs, approximately 2% of its 93,500 employees, and trimming fiscal year 2019 capital expenditures, including on manufacturing, in addition to accelerating other cost control reductions it said were already underway.

41.     On this news, the price of 3M common stock fell $28.36 per share, or nearly 13%, to close at $190.72 per share on April 25, 2019.

42.     On May 14, 2019, New Jersey filed suit against 3M and other PFAS manufacturers alleging environmental and consumer fraud claims in connection with making and selling firefighting foam products for decades in New Jersey that contained toxic chemicals. Noting that nearly one in five New Jersey residents had received tap water that contained at least trace amounts of one of these chemicals, some of which have been linked to cancer, the lawsuit alleged that the companies knew that their firefighting foam posed a significant health threat.

43.     On May 29, 2019, New Hampshire filed two lawsuits against 3M and others for PFAS contamination.  New Hampshire Attorney General Gordon MacDonald said the goal was to recoup damages for the PFAS contamination that had been found in all ten New Hampshire counties, noting that, in towns like Merrimack and Portsmouth, the contamination had put

hundreds of families on bottled water.  "'It is my hope that those responsible for the manufacture and distribution of PFAS will recognize the severity of the issues they've caused and will become part of the solution,'" MacDonald was quoted saying.

44.     On this news, the price of 3M common stock declined from its close of $163.35 per share on May 28, 2019 to trade as low as $160.50 per share in intraday trading and close at $161.40 per share on May 29, 2019.

45.     On June 6, 2019, Barclays issued a report, entitled "PFAS/PFOS/PFOA Liabilities for Chemours, 3M, and JCI," stating in relevant part:

> PFAS/PFOS/PFOA liability for Chemours, 3M, and JCI has been top-of-mind for many of our Industrial/Materials investors in recent weeks for three main reasons: a) an investor presentation on the risks to MMM/CC at the Sohn conference in early May. After the Sohn conference on May 6th, CC and MMM were down the two days after that presentation 8% and 2% respectively vs. the XLI down 2%. b) 3M updated its reserve for remediating plant sites with PFAS contamination with 1Q earnings. c) The state of NJ AG came out with a headline grabbing suit against CC/3M/JCI plus others on March 25th.

46.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of 3M securities, by publicly issuing false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its business, and its operations, as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class (as defined below).  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about 3M's business, prospects, and operations.  These material

misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of 3M and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

48.     The economic loss that Plaintiff and other members of the Class suffered was a direct result of defendants' fraudulent scheme to artificially inflate the price of 3M's securities and maintain the price at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of 3M's securities when defendants' earlier misrepresentations and omissions became publicly available.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of 3M securities during the Class Period (the "Class"), excluding defendants and 3M's officers and directors at all relevant times, as well as their respective family members, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

50.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. 3M securities were actively traded on NYSE. Record owners and other members of the Class may be identified from records maintained by 3M or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to Plaintiff, 3M reported more than 575.8 million shares outstanding held by 76,596 shareholders of record as of January 31, 2019.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)      Whether defendants' acts as alleged herein violated the federal securities laws;

b)      Whether defendants' statements made to the investing public misrepresented or omitted material facts about 3M's business, operations, and financial condition;

c)      Whether the price of 3M securities was artificially inflated during the Class Period; and

d)      To what extent the Class members have sustained damages and the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

55.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

56.     Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for 3M securities was an efficient market at all relevant times by virtue of the following factors, among others:

a)     3M securities met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

b)     As a regulated issuer, 3M filed periodic public reports with the SEC and the NYSE;

c)     3M regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)     3M was eligible to file, and did file, a shelf registration statement on Form S-3 with the SEC during the Class Period; and

e)     3M was followed by several securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the market.

57.     As a result of the foregoing, the market for 3M securities promptly incorporated current information regarding 3M from publicly available sources and reflected such information in the price of 3M securities.   Under these circumstances, all those who transacted in 3M

securities during the Class Period suffered similar injury through their transactions in 3M securities at artificially inflated prices and a presumption of reliance applies.

58.     At the times they purchased 3M securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

59.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

60.     During the Class Period, the defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.     The defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

    a)     employed devices, schemes, and artifices to defraud;

    b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of 3M securities during the Class Period.

23

62.     In addition to the duties of full disclosure imposed on the defendants as a result of their affirmative false and misleading statements to the public, the defendants had a duty to promptly disseminate truthful information with respect to 3M's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's PFAS litigation exposure trends, so that the market price of the Company's securities would be based on truthful, complete, and accurate information.  SEC Regulations S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*).

63.     As a direct and proximate result of the defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their respective purchases of 3M securities during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for 3M securities and experienced losses when the artificial inflation was released from 3M securities as a result of the revelations and price declines detailed herein. Plaintiff and the Class would not have purchased 3M securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

64.     By virtue of the foregoing, the defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

65.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of 3M within the meaning of Section 20(a) of the Exchange Act:

a)      By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading;

b)      The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading before or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

c)      Because of their positions as CEO and CFO, the Individual Defendants directly participated in the Company's management and were directly involved in 3M's day-to-day operations.  The Individual Defendants also controlled the contents of 3M's periodic SEC reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

67.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Declaring that defendants are liable pursuant to the Exchange Act;

C.     Awarding compensatory damages in favor of Plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs, and expenses incurred in this action; and

E.     Awarding such other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  August 22, 2019                    Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jonathan Lindenfeld*
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

***Attorneys for Plaintiff***

**Submission Date**

2019-07-30 13:48:43

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.   I  make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against 3M Company ("3M" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire 3M securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired 3M securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in 3M securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

## Name

**Print Name**

Bruce Rousseau

**Signature**

**Full Name**

**3M Company (MMM)**                                                      **Rousseau, Bruce**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|----------------------|---------------------|
| 4/25/2019 | Purchase | 30 | $195.0000 |